**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 1:84-cr-00456** |
| | : | |
| **SASSAN NASSIRI-MOTLAGH,** | : | |
| | : | |
| Defendant. | : | |

**PETITION FOR WRIT OF ERROR CORAM NOBIS
TO VACATE AND SET ASIDE PLEA AND CONVICTION**

Sassan Nassiri-Motlagh, through undersigned counsel, respectfully requests that the Court issue a writ of error coram nobis, vacate his conviction and withdraw his guilty plea in the above-captioned case due to the denial of his Sixth Amendment constitutional right as his trial counsel was constitutionally ineffective and he has suffered severe prejudice as a result thereof.

A supporting memorandum of points and authorities and proposed Order are attached for the Court's consideration.

Respectfully submitted,

**THE LAW FIRM OF
CARROLL CRUMBAUGH LOVE PLLC**

/s/ Carroll Virginia Crumbaugh Love

_____
Carroll Virginia Crumbaugh Love (477973)

*Washington, DC Office:*
400 7th Street NW
Suite 206
Washington, DC  20004

*Annapolis, MD Office & Mailing Address:*
918 Chesapeake Avenue
Suite 3R

1

Annapolis, MD 21403

Telephone (202) 861-0076
Facsimile  (202) 595-7042
*cclove@cclovelaw.com*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:84-cr-00456** |
| | : | |
| **SASSAN NASSIRI-MOTLAGH,** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PETITION FOR WRIT OF ERROR CORAM NOBIS
TO VACATE AND SET ASIDE PLEA AND CONVICTION**

Sassan Nassiri-Motlagh, through undersigned counsel, respectfully requests that the Court issue a writ of error coram nobis, vacate his conviction and withdraw his guilty plea in the above-captioned case due to the denial of his Sixth Amendment constitutional right as his trial counsel was constitutionally ineffective and he has suffered severe prejudice as a result thereof. In support of this motion, Mr. Nassiri-Motlagh (hereinafter "Mr. Nassiri") states as follows:

I.    **INTRODUCTION**

In 1979, then 17-year-old Sassan Nassiri-Motlagh arrived in the United States on a student visa, seeking refuge and safety from the imminent threat of torture and death in his home country of Iran. Mr. Nassiri enrolled in local universities and began to build a new life in the United States, but the transition was far from easy. While coping with the deep trauma that had shaped his life from an early age —his father's assassination shortly after his birth and the violent political upheaval of the Iranian Revolution that forced him and his family into exile – Mr. Nassiri faced the emotional and cultural hurdles of assimilating into a new country, in addition to the typical transitional struggles of young adulthood and college life. The convergence of these profound challenges eventually led to his involvement and arrest in the instant case.

3

By the fall of 1984, 22-year-old Mr. Nassiri had settled into his new life in America and integrated into traditional college culture. He began attending parties, where he was introduced – for the first time -- to illicit substances supplied by a Lebanese student, Hazem. Even though he only experimented with drugs a handful of times over a short period of time, Mr. Nassiri still accumulated a small debt to Hazem. Unable to repay the debt, Hazem offered Mr. Nassiri an alternative to payment: connect Hazem with someone who could supply a large quantity of cocaine. Unable to repay the debt and fearing for his and his family's safety, Mr. Nassiri felt he had no real choice but to facilitate the connection—an action that ultimately led to his arrest in a sting operation involving law enforcement and Hazem, who he later learned had been cooperating with authorities the entire time to resolve his own legal problems.

At the young age of twenty-two (22), unfamiliar with the legal system and new to the country, Mr. Nassiri pleaded guilty to one count of conspiracy to possess and distribute cocaine relying on his trial counsel's misadvice regarding the immigration consequences he faced. As a direct result of his plea and conviction, and in stark contrast to his trial counsel's misadvice, Mr. Nassiri has endured severe and devastating immigration consequences that continue to plague him to this day.

Shortly after he was convicted, and contrary to his trial counsel's advice, Mr. Nassiri was placed into deportation proceedings, denied withholding of deportation, ordered deported, rendered inadmissible and permanently barred from ever adjusting his status to a legal permanent United States resident. Indeed, had Mr. Nassiri been accurately advised by trial counsel that his guilty plea would render him presumptively deportable and prohibited from ever becoming a permanent United States resident, Mr. Nassiri would have sought an immigration-mitigative

disposition, and if that failed, insisted on going to trial. This is certainly true considering the potential death sentence that awaited him if he was forced to return to Iran.

While Mr. Nassiri was eventually granted asylum in the early 1990s, he has remained an asylee for the past thirty-three (33) years as his plea and conviction in his case rendered him permanently ineligible to adjust his status to legal permanent resident. As an asylee, Mr. Nassiri has lived an exemplary, law-abiding life in the United States over the past three decades, establishing a successful career despite the significant hardships and hurdles he faced as a result of his tenuous immigration status and conviction. He additionally has been a dedicated and productive member of society, contributing positively to his community while raising his daughter with his United States citizen wife. Mr. Nassiri has demonstrated unwavering commitment to his family, work, and the community that he has long called home.

Though Mr. Nassiri has been protected by his asylee status, this protection remains tenuous and uncertain. Indeed, as his conviction permanently bars him from adjusting his status to that of a legal permanent resident, the constant threat of removal to Iran looms ominously over him, ever-present should he lose the precarious protection of asylum. As a result, Mr. Nassiri has lived in constant anxiety and fear of deportation for the past thirty-three (33) years. If deported, Mr. Nassiri not only faces the risk of persecution and potential death in Iran, but also permanent exile from his United States citizen wife, daughter, and family, along with the tragic loss of the immensely successful and positive life he has built in the United States over the past three decades.

Despite receiving a minor seven-week jail sentence and three years probation, as a direct result of his trial counsel's misadvice, Mr. Nassiri ultimately was condemned to a lifetime of severe, devastating, and draconian immigration consequences — punishment directly contrary to his trial counsel's advice and vastly disproportionate to the gravity of his offense and sentence.

As Mr. Nassiri was denied his Sixth Amendment right to constitutionally effective assistance of trial counsel, and has suffered significant prejudice as a result, he requests that this Court issue a writ of error coram nobis and vacate the conviction in the above-captioned case.

## II.    PROCEDURAL BACKGROUND

On November 3, 1984, then 22-year-old Sassan Nassiri-Motlagh was arrested and charged with unlawful possession with intent to distribute cocaine in the United States District Court for the District of Columbia.  The Honorable Magistrate Judge Dwyer released Mr. Nassiri on an unsecured cash bond and ordered the surrender of Mr. Nassiri's Iranian Passport on November 5, 1984.  Attorney Frank Mika entered his appearance on Mr. Nassiri's behalf on November 21, 1984.  Mr. Nassiri was subsequently indicted by the grand jury on November 29, 1984, and charged with unlawful possession with intent to distribute cocaine in violation 21 U.S.C. § 841(a).[1]  Mr. Nassiri was arraigned on December 11, 1984, in front of the Honorable June L. Green.  After an initial status hearing in early January 1985, a superseding criminal information was filed on January 29, 1985, charging Mr. Nassiri with conspiracy to unlawfully possess and distribute cocaine in violation of 18 U.S.C. § 371.[2]  Mr. Nassiri pled guilty to the superseding criminal information that same date, January 29, 1985. On March 7, 1985, Judge Greene sentenced Mr. Nassiri to three (3) years imprisonment with all but six (6) months suspended; three (3) years probation and a $50 assessment. Mr. Nassiri was ordered to surrender himself to Hope Village at the Community Correction Center on April 3, 1985.  On May 16, 1985, Mr. Nassiri filed a motion for reconsideration and reduction of sentence.  Judge Green granted the motion on May 23, 1985, and reduced his jail sentence to time served.  As a result, Mr. Nassiri only served seven weeks in jail

---

[1] Maximum penalty fifteen (15) years imprisonment and/or $25,000 fine. *See* 21 U.S.C. § 841(b)(1)(a) (1982).
[2] Maximum penalty five (5) years imprisonment and/or $10,000 fine. *See* 18 U.S.C. § 371 (1982).

of the original six-month executed sentence. Mr. Nassiri's probation terminated successfully in May 1988.

### III.  SASSAN NASSIRI'S RELEVANT BACKGROUND

Sassan Nassiri-Motlagh was born in Tehran, Iran, on June 1, 1962.[3]  He is the youngest of seven children born to his mother, Rezvan Barzin, and father, General Hasan Nassiri-Motlagh. Mr. Nassiri's life from a very young age was marked with tragedy and violence.  Mr. Nassiri's father, Hasan, was a General in the Iranian Air Force and specially chosen by Shah Mohammad Reza Pahlavi himself to be the Chief Engineer of the Imperial Aircraft to fly the Shah's private plane due his father's unwavering loyalty to the monarch.  When Mr. Nassiri was only four months old in 1962, tragedy struck – his father was murdered by anti-monarchist terrorists after they bombed and blew up General Nassiri's plane in an assassination attempt on the Shah's life.[4]

Indeed, from his earliest memories, Mr. Nassiri recalls a constant state of fear due to his father's murder and the deteriorating political state in Iran.  The period following his father's death in Iran was marked by political unrest and increasing violence. While the Shah's White Revolution in the mid-1960s was meant to rapidly transform Iran into a modern state, the reforms were accompanied by significant social and economic upheaval, resulting in the suppression of dissidents by the Shah's regime and its notorious secret police, SAVAK.

Fueled by widespread political unrest and opposition to the Shah's regime, Iran experienced significant and escalating violence against loyalists to the Shah from the mid-1960s on.  Revolutionary groups increasingly resorted to violent means to challenge the Shah's authority. Targeted attacks on Shah loyalists, such as members of the secret police, military officers, and

---

[3] *See generally* Affidavit of Sassan Nassiri-Motlagh, attached as Exhibit 1.
[4] *See* Photos of General Hasan Nassiri-Motlagh and Shah Mohammad Reza Pahlavi, and Ancestral Nassiri-Motlagh Family Photos, attached as Exhibit 2.

government officials, and their families, became more frequent. Resistance movements and underground groups actively worked to undermine the Shah's regime through violent means to challenge the established order, disrupt government control and galvanize public opposition.

As the revolution gained momentum in the 1970s, violence against supporters of the Shah escalated significantly in both scale and ferocity. Mass protests and riots often resulted in bloody clashes between revolutionary forces and loyalists. Demonstrators targeted Shah loyalists and symbols of the Shah's rule leading to widespread destruction, violence and chaos. Indeed, protests turned many urban areas into battlegrounds.

Public reprisals against loyalists to the Shah and perceived collaborators became increasingly brutal. Revolutionary fervor fueled summary executions, public show trials, and lynchings. Revolutionary tribunals, often hastily assembled and lacking due process, handed down death sentences to many former officials and others associated with the Shah's regime. In many towns and cities, enraged mobs took justice into their own hands, dragging suspected loyalists from their homes or workplaces to face immediate and often fatal punishment. The pervasive atmosphere of fear and retribution not only underscored the depth of hatred towards the Shah's regime but also marked a chaotic and violent transition to the new order under Ayatollah Khomeini's Islamic Republic.[5]

Amid the backdrop of political upheaval and escalating violence, Mr. Nassiri was raised by his young, widowed mother alongside his four older siblings in the turbulent city of Tehran. As the violence intensified, his mother became increasingly worried about Mr. Nassiri's safety due to his father's prominent position in the Shah's regime and the escalating violence against loyalists

---

[5] *See* Amnesty Int'l, *Iran Briefing* (1987), attached as Exhibit 3.

to the Shah.  Fearing for his safety, Mr. Nassiri was sent alone at age fourteen to attend high school in Switzerland to escape the worsening political unrest, turmoil and violence.

Isolated in Switzerland, Mr. Nassiri felt the heavy burden of being separated from his mother and siblings amidst the violent chaos in Iran. While Mr. Nassiri found safety in Switzerland, he constantly feared for his family.  The reports of widespread executions and the harsh treatment of those loyal to the Shah only intensified his fear for his family's safety back in Iran. This era of intense persecution profoundly affected Mr. Nassiri, marking his high school years with a constant undercurrent of fear and concern for his family's lives.

After the Shah fled Iran in January 1979, the revolutionaries took control, and a systematic purge of former regime loyalists ensued. As the Iranian Revolution reached its climax in the summer of 1979, violence against Shah loyalists escalated dramatically. The collapse of the Shah's reign unleashed a wave of retribution against those associated with the Shah's regime. Revolutionary fervor led to the widespread targeting of former government officials, military officers, and anyone perceived as supportive of the Shah, including family members of such perceived collaborators. Thousands were executed, often after hastily conducted public show trials that lacked any semblance of due process.  The atmosphere was charged with a desire to purge the country of any remnants of the old regime, leading to widespread fear and uncertainty among those associated with the Shah.  The violence extended into the streets, where mobs often attacked suspected loyalists. Revolutionaries and vigilante groups took matters into their own hands, conducting raids and meting out swift and brutal justice.  Many Shah loyalists were arrested, tortured, and executed, their properties confiscated, and their families ostracized.

As the Islamic Revolution reached its violent crescendo in the spring of 1979, Mr. Nassiri was unable to return to Iran following his graduation from high school.  Due to the escalating

violence and targeted attacks on suspected loyalists, returning to Iran would have likely resulted in death. Indeed, many of his family members – except his mother – had escaped Iran and sought refuge in the United States and other countries to evade the violent Revolution. To be sure, their fears were not unfounded, as his mother's house was rampaged and sacked by the Revolutionary Guards in 1980. Despite his profound desire to return to his homeland, Mr. Nassiri was forced to begin anew, again, in a foreign country—this time, the United States.

### A.    Sassan Nassiri Immigrates to the United States – College Years

In July 1979, Mr. Nassiri arrived in the United States on a student visa at 17-years-old to attend the University of Maryland. Mr. Nassiri applied specifically to University of Maryland to be near his older sister who had immigrated to the United States several years earlier. As a foreign college freshman, Mr. Nassiri began the arduous journey of navigating the challenges of adapting to a new culture and finding his place in a new society and country.

While attending University of Maryland, Mr. Nassiri's mother immigrated to the United States after her home was ransacked by revolutionaries in 1980. By 1980, many of Mr. Nassiri's family members, including his sisters and their families, had also escaped the deteriorating conditions in Iran and moved to the Washington, D.C. area to be close to one another. Indeed, other than a brief stint of living in a dorm at University of Maryland, Mr. Nassiri lived most of his college and young adult years with his mother until her death in 2008.

While the transition to college is often difficult for any young adult, Mr. Nassiri faced the additional and significant challenge of starting a new life in a new country. As his American peers faced their own struggles in adjusting to college life, Mr. Nassiri not only had to contend with significant cultural differences, but the challenges of discrimination and xenophobia by his American peers. Indeed, Mr. Nassiri had only been in the United States for four months before a

group of Iranian students, fueled by anti-American sentiment, stormed the U.S. embassy in Tehran and seized over 50 hostages for 444 days. Caught in the crossfire of escalating political tension, Mr. Nassiri faced increased scrutiny and discrimination by his own peers on campus. Many treated him as suspect due to his Iranian nationality. The hostility on campus escalated into violence against Mr. Nassiri: students hurled Mr. Nassiri's bed, clothes, and belongings out of his dorm window. To protect his safety – this time, in the United States – Mr. Nassiri decided to move off campus and live with his mother and nephew.

As a result, Mr. Nassiri spent the majority of his University of Maryland years with his extended family, including his nieces and nephews – some of whom were his age due to the wide age range between himself and his older sisters. In addition to the discrimination Mr. Nassiri faced, his focus on academic and familial responsibilities culturally set him apart, making it difficult to establish common ground with his peers. While Mr. Nassiri's contemporaries were often engaged in social events and nightlife, Mr. Nassiri dedicated his time to his academics and his extended family. Additionally, the profound impact of Mr. Nassiri's violent and turbulent past made it challenging to relate to the seemingly carefree and socially active lifestyle of his classmates. As a result, Mr. Nassiri often felt excluded and isolated navigating a complex journey of integrating into a new culture while maintaining his dedication to his studies and family.

In December 1981, Mr. Nassiri graduated with an Associate's Degree from the University of Maryland with a 3.5 GPA. He matriculated to American University in January 1982 to complete his four-year degree with the intention of pursuing a career in finance and computer information systems. At the beginning of his tenure at American University, Mr. Nassiri continued to have a difficult time assimilating into the traditional college culture. However, by 1984, Mr. Nassiri had found his way in America and assimilated into a clique of peers. Like a traditional college student,

he spent more time with his friends than his family.  Unfortunately, it was this same year that Mr. Nassiri was arrested in the instant case in November 1984.

     1.    **Offense**

In the fall of 1984, Mr. Nassiri befriended a former American University student, Hazem. Mr. Nassiri began to attend college parties on the weekends with Hazem and his other new friends. At those parties, Hazem and his friends introduced Mr. Nassiri to cocaine.  Unbeknownst to Mr. Nassiri at the time, Hazem had been previously arrested for drug possession and was working as a confidential informant with the government in an attempt to mitigate his own criminal issues.

Although Mr. Nassiri had never previously used drugs, intense peer pressure and a strong desire to fit in with his peers and assimilate into American culture led him to occasionally use illicit substances at weekend parties with Hazam and his friends.  Even though his use was limited, he ran up a small drug debt with Hazem – a debt he had little to no means to pay back.

By late fall of 1984, Hazem's demands for debt repayment became increasingly ominous and menacing towards Mr. Nassiri.  Since Mr. Nassiri was unable to repay the debt, Hazem proposed an alternative: Mr. Nassiri could work off what he owed by connecting Hazem with someone who could supply a large quantity of cocaine—essentially, making a drug connection for Hazem.  Mr. Nassiri feared that if he did not either repay the debt or facilitate the drug connection, Hazem's drug associates would harm both Mr. Nassiri and his family.

Initially, Mr. Nassiri refused to find a connection as he was desperate to distance himself from the situation.  He was also particularly fearful of large-scale drug dealers because of their violent reputations, which he had seen on television and on the news.  Moreover, and importantly, he did not know any large-scale drug dealers or anyone with access to a significant supply of drugs.

Ultimately, Mr. Nassiri had no choice. Unable to raise the money Hazem demanded, Mr. Nassiri feared for himself and his family, worried about what might happen if he didn't cooperate with Hazem's demands. Without any real choice, he contacted a former high school friend who was attending a Delaware university.  The friend introduced Mr. Nassiri to "Bill" who purported to have a large cocaine connection.  Initially, Mr. Nassiri attempted to distance himself from the situation by merely providing Bill's phone number to Hazem, but this did not satisfy Hazem. Fearing for his and his family's safety, and under intense pressure from Hazem, Mr. Nassiri reluctantly agreed to arrange a meeting between Hazam and Bill on November 3, 1984.

On November 3, 1984, Mr. Nassiri drove Bill to meet with Hazem and an individual unknown to them in Hazem's car, parked on New Mexico Ave., N.W. Unbeknownst to Mr. Nassiri and Bill, the unknown individual was an undercover DEA agent.  At the meeting, Hazem and the undercover agent requested to buy a large amount of cocaine from Bill.  However, the undercover agent became upset when Bill did not have the quantity of cocaine he was expecting to buy.   As a result, no deal occurred, and Mr. Nassiri and Bill returned to Mr. Nassiri's car.  As Mr. Nassiri began to drive away, police swarmed his car and Bill tossed a bag of cocaine under the car from under the passenger seat. The agents arrested both Mr. Nassiri and Bill (co-defendant William H. Marin) and charged them with unlawful possession with intent to distribute cocaine in the United States District Court for the District of Columbia.[6]

Even after his arrest and during the pendency of the case, Mr. Nassiri managed to excel on his finals and graduate from American University with a 3.3 GPA in December 1984 with a

---

[6] Counsel cannot locate any record of the result of Mr. Marin's case.  The court file indicated that Mr. Marin had absconded during the pendency of the case, and a bench warrant was issued for his arrest.

Bachelor of Science degree in Business Administration, majoring in Management Information Systems.[7]

During the brief pendency of the case, Mr. Nassiri worried that going to trial could potentially expose him and his family to danger from Hazem and his drug associates. As a result, he believed that pleading was the quickest way to resolve the situation and ensure their safety. Furthermore, as discussed in detail *infra*, Mr. Nassiri was advised by his trial counsel that his guilty plea and conviction would not result in presumptive deportation and that he would not be barred from becoming a legal permanent resident. Accordingly, Mr. Nassiri swiftly pleaded guilty on January 29, 1984 -- just 2.5 months after his arrest – to one count of conspiracy to unlawfully possess and distribute cocaine in violation of 18 U.S.C. § 371, as charged in the superseding criminal information.[8]

In March 1985, the Court sentenced Mr. Nassiri to three (3) years imprisonment with all but six (6) months suspended to be served at the Community Corrections Center (CCC), a facility for non-violent offenders with short sentences. He was also sentenced to three years of supervised probation. Due to his exceptional behavior at CCC,[9] the Court released Mr. Nassiri after serving only seven weeks in May 1985. After his release from jail, Mr. Nassiri successfully completed a lengthy three-year supervised probation period in May 1988.[10]

---

[7] *See* American University Diploma, attached as Exhibit 4.
[8] Undersigned counsel has verified with the Clerk that the transcript of the plea proceedings is not in the record in this case and cannot otherwise be located.
[9] *See* Susan Glick, Letter (May 15, 1985), attached as Exhibit 5.
[10] *See generally* R. Michael Suser, U.S. Probation Officer, *Letter to Lance K. Levenstein* (Aug. 8, 1986), attached as Exhibit 6.

B.    **Post-Offense – Obstacles and Career Achievements**

After his release from jail, Mr. Nassiri did his best to overcome the challenges posed by his criminal record. Upon his graduation from American University, Mr. Nassiri had landed his dream job as a broker at a securities firm. Indeed, even while incarcerated at CCC, Mr. Nassiri tried to complete his initial job training. However, his dreams were shattered when he discovered that the firm required a criminal record check to obtain his broker's license. As he knew he would never pass the background, Mr. Nassiri resigned from the brokerage firm and abandoned his dream of becoming a securities broker.

Despondent, as he could not seek employment in the financial sector due to his felony conviction, Mr. Nassiri was forced to find work that would not be barred by this criminal record. In May 1985, Mr. Nassiri was hired as a sales manager at a local carpet store and held that job for three years. From 1988 to 1990, Mr. Nassiri co-owned and managed a designer flooring company.

While grappling with severe job restrictions, and contrary to his trial counsel's advice, Mr. Nassiri also faced a devastating immigration consequence of his plea and conviction: deportation to Iran. In March 1986, Mr. Nassiri was issued an Order to Show Cause for Deportation Proceedings as a result of his conviction. Mr. Nassiri spent the next six years in agony and fear, anxiously waiting to see if his mistake of getting involved with Hazem would lead to his exile to Iran, where he faced death at the hands of the Revolutionary Guards. It was not until March 14, 1991—six years after his conviction—that the Immigration Court granted his asylum claim and allowed him to stay in the United States as an asylee.[11]

While his deportation case was pending, during the mid-late 1980s, Mr. Nassiri continued to live and care for his elderly mother who was suffering from serious health issues. Sadly, his

---

[11] *See* Order, *In re Sassan Nassiri-Motlagh*, File No. A 24-648-332 (Immigr. Ct. Mar. 14, 1991), attached as Exhibit 7.

mother suffered a stroke when Mr. Nassiri was in jail in 1985 and was struggling with serious heart and arthritis health problems. As a result of her extremely limited ability to care for herself, Mr. Nassiri supported his mother financially and cared for all the household, and her personal and medical needs. While his sisters lived nearby and helped to some extent, Mr. Nassiri was expected to care for his mother due to his age and status in their family.

Even while caring for his mother and working full-time, Mr. Nassiri found what little alone time he had to date. He eventually married a young Iranian American woman in 1988, in a non-legal ceremony. However, the marriage lasted less than one year, unraveling under the intense stress he faced while uncertain of his ability to remain in the country. His young wife was unwilling to leave America and her family if Mr. Nassiri was forced to return to Iran. Their marriage became another casualty of Mr. Nassiri's criminal record and tenuous immigration situation.

Throughout the late 1980s, Mr. Nassiri continued to struggle with the loss of his chosen profession. While he excelled in his managerial positions and running his flooring company, Mr. Nassiri yearned to work in finance or technology. As the financial field was clearly unattainable, he clung to the hope that he might one day obtain a job in computers and information systems. In 1991, he did just that – Mr. Nassiri began a position in technical sales and as a systems consultant for a data communication firm, ComputerPros Inc., in Rockville, Maryland. At ComputerPros, Mr. Nassiri flourished for five years, not only as a technical salesperson but ultimately, as a systems engineer.

Since his first computer-related job in 1991, Mr. Nassiri has built a diverse and impressive career in the technology field. The breadth of Mr. Nassiri's career is marked by significant achievements and a steady ascent through increasingly complex and responsible managerial roles.

He has held positions at multiple local, national and international organizations as a systems engineer, network engineer, technical analyst, technical engineer, senior technical consultant, program manager and vice president.[12]  Mr. Nassiri's ascension in the tech field culminated to his current position of Vice President of Project Management – a position he has held for the past nine (9) years. His C-Suite position demonstrates not only his project management skills, but his exceptional leadership skills.  Indeed, Mr. Nassiri is regarded by his colleagues as an invaluable asset to his organization.[13]

Furthermore, Mr. Nassiri has never stopped furthering his career and education.  He has earned multiple certifications in computer technology, software, and engineering and networking, including: Novell Authorized CNE (1995); Novell Authorized CNE NetWare 3 (1997); Microsoft Systems Engineer; Microsoft Certified Professional + Internet; Microsoft Certified Professional; Microsoft Certified Technology Specialist; Microsoft Install/Config SQL Server 7.0 Preview (1998); Oracle Enterprise DBA Part 1A, Architecture and Administration (2000); CompTIA Project+ Certified (2011); CompTIA A+ Certified CE (2011); Technical Institute of America 35 Hours Project Management Professional Exam Prep (2014); and Project Management Institute Project Management Professional (PMP) certification (2020).[14]

While Mr. Nassiri has had a tremendously successful career, his success was the result of hard work in spite of the obstacles posed by his conviction and immigration status.  Throughout his career, Mr. Nassiri has faced extremely limited job options at his high skill level and expertise. Many positions were inaccessible due to his felony conviction or because they required a security

---

[12] *See* Sassan Nassiri's Current and Former Resumes, attached as Exhibit 8.
[13] *See* B. John Farmakides, President and CEO Lafayette Federal Credit Union, Letter (July 8, 2024); Jeff Ference, Senior Vice President & Chief Operations Officer, Letter (July 1, 2024), attached as Exhibit 9.
[14] *See* Sam Nassiri's Professional Certifications, attached as Exhibit 10**.**

clearance. As a non-citizen with a felony conviction, Mr. Nassiri has been permanently ineligible for a security clearance, a significant obstacle in a field where most expert-level roles involve government contracts dealing with classified and sensitive information. Consequently, after five years with a company in 2014, Mr. Nassiri had no choice but to voluntarily step down from his role as project manager when his next assignment involved a government contract that required a security clearance. Following that resignation, it took him months to find another expert-level position that required neither a security clearance nor was prohibited by his felony conviction. Today, although Mr. Nassiri deeply values his position at his current organization, he has hit an unbreakable glass ceiling. Despite his high-level expertise, the albatross of his conviction and immigration status has effectively smothered any opportunity for him to advance further in his career.

### C.    Family, Humanitarian & Charitable Work

While Mr. Nassiri was climbing the tech ladder, he never gave up hope of marrying again and starting a family. In 1999, Mr. Nassiri's two-year engagement to a British woman ended after his fiancée realized that she could never attain permanent legal status in the United States due to Mr. Nassiri's precarious immigration status. The breakup devastated Mr. Nassiri, as his relationship became yet another victim of his conviction and uncertain immigration situation.

After his break-up, Mr. Nassiri continued living and caring for his elderly and ailing mother in a cramped two-bedroom apartment in the early 2000s. Just when he had almost given up hope, fate intervened, and in 2006, Mr. Nassiri met his now-wife, Anita, on an online Persian dating site. Like Mr. Nassiri, Anita was born in Iran and had immigrated to the United States. The pair shared much in common, from their Persian backgrounds to their families and life experiences. They

married in 2007 surrounded by their families after dating for one year.[15] Tragically, Mr. Nassiri's mother passed away the following year, in 2008, when he was only 46 years old. However, amidst the sorrow, there was also extreme joy, as that same year the Nassiris welcomed their only child, a daughter.

The Nassiris have enjoyed a strong, loving marriage for the past seventeen (17) years, raising their only child together and surrounded by the support of extended family and friends in the United States.[16] Today, their daughter is an academically accomplished, gifted, and talented 16-year-old high school junior at a local high school.

In addition to being a devoted and involved father, husband, family member and friend, as well as an accomplished and successful computer engineer and manager, Mr. Nassiri has actively supported numerous democratic movements, humanitarian causes, and charities. In the late 1980s, Mr. Nassiri became involved as an Iranian political activist with the Free Iran Coalition, a Washington, D.C. organization of Iranian expatriates that supported the formation of a democratic Iran and opposed the Islamic Republic and the tyrannical and oppressive ruling Ayatollahs.[17] As a member of FIC, Mr. Nassiri advocated for democratic change and human rights in Iran through meetings, membership drives, rallies, media and educational events.

Today, Mr. Nassiri continues support the movement for a free, democratic Iran and for women's rights. Following the death in 2022 of Mahsa Amini, a young woman arrested for not wearing a hijab in Iran, the "Woman, Life, Freedom" movement erupted internationally, calling for women's rights. The Nassiris were involved in several peaceful demonstrations in Washington, D.C.

---

[15] *See* Sassan Nassiri Wedding Photos, attached as Exhibit 11.
[16] *See* Sassan Nassiri Family and Friends Photos, attached as Exhibit 12.
[17] *See* FIC Pamphlet, attached as Exhibit 13. FIC is no longer active.

In the early 2000s, Mr. Nassiri began his charitable work by sponsoring several international children for over ten (10) years through the International Child Foundation.[18]  His charity work continued in 2017 when he began donating to St. Jude Children's Research Hospital, a nonprofit organization involved in the treatment and research of childhood cancer and other life-threatening diseases.

Mr. Nassiri intends to retire within the next seven to ten (7-10) years. In retirement, he plans to focus on non-profit work, leveraging his technical expertise as a computer engineer and manager to support humanitarian efforts, including local and international democratic causes, women's rights, and advocating for a free Iran. However, his participation in international initiatives will be severely limited as his felony conviction and immigration status restrict his ability to travel outside of the United States. Despite these challenges, Mr. Nassiri remains committed to using his professional skills and passion for social justice and democratic ideals to make a lasting impact and give back to the community.

## IV.   SASSAN NASSIRI IS ENTITLED TO THE ISSUANCE OF A WRIT OF ERROR CORAM NOBIS

Sassan Nassiri is entitled to the issuance of a Writ of Error Coram Nobis as he was denied his Sixth Amendment right to counsel.  Mr. Nassiri's trial counsel rendered constitutionally ineffective assistance of counsel by affirmatively misadvising Mr. Nassiri regarding the immigration consequences of his plea and he has suffered significant prejudice as a result.

It is well established that pursuant to the All Writs Acts, 28 U.S.C. § 1651, a federal court has the discretionary power to issue a writ of error coram nobis "to set aside an underlying conviction and sentence which, for a valid reason, should never have been entered." *United States v. Hansen,* 906 F.Supp. 688, 692 (D.D.C. 1995).  Unlike federal habeas corpus, there is no custody

---

[18] *See* Child Foundation Sponsorship Letters, attached as Exhibit 14.

requirement or time limitation for a petitioner to attack his conviction pursuant to a writ of error

coram nobis. *Id. See also* 28 U.S.C. § 2255.  "A petition for a writ of <u>coram nobis</u> provides a way

to collaterally attack a criminal conviction for a person ... who is no longer 'in custody' and

therefore cannot seek habeas relief under 28 U.S.C. § 2255 or § 2241." *United States v. Newman*,

805 F.3d 1143, 1146 (D.C. Cir. 2015) (quoting *Chaidez v. United States*, 568 U.S. at 345 n.1); *See*

*also United States v. Williams*, 2022 WL 3211805, at *3 (D.D.C. Aug. 9, 2022).  "This right

recognizes that 'a person who had completed service of his federal sentence might continue to

suffer consequences because of it, since subsequent convictions might carry heavier penalties and

civil rights might be affected." 3 CHARLES ALAN WRIGHT & SARAH N. WELLING,

FEDERAL PRACTICE AND PROCEDURE § 624 (4th ed. 2021) (citing *United States v. Morgan*,

346 U.S. 502, 512-13 (1954)). *See also Williams*, 2022 WL 3211805, at *3. The writ is an

"extraordinary remedy" to be used "only under circumstances compelling such action to achieve

justice." *Morgan*, 346 U.S. at 511. *See also United States v. Denedo,* 556 U.S. 904, 911 (2009).

The Supreme Court in *United States v. Morgan*, held that coram nobis relief is available to

correct "errors of the most fundamental character . . . where no other remedy [is] available and

sound reasons exist for failure to seek appropriate earlier relief." *Morgan,* 346 U.S. at 512.

"[C]ourts have traditionally applied a four-factor test to determine whether <u>coram nobis</u> relief is

warranted: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the

conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case

or controversy requirement of Article III; and (4) the error is of the most fundamental character."

*Williams*, 2022 WL at *3 (quoting *United States v. Verrusio*, No. 09-00256, 2017 WL 1437055,

at *8 (D.D.C. Apr. 21, 2017) (citing *United States v. Faison*, 956 F. Supp. 2d 267, 269 (D.D.C.

2013) (internal quotation marks omitted))); *See also United States v. Hansen*, 906 F. Supp. 688,

692–93 (D.D.C. 1995; *See e.g. Lindberg v. Assam*, No. MC 23-0096 (UNA), 2023 WL 6441919, at *1 (D.D.C. Oct. 3, 2023); *Fishman v. Garland*, CV 21-3049 (RC), 2023 WL 2645665, at *2 (D.D.C. Mar. 27, 2023).

A "writ of *coram nobis* can issue to redress a fundamental error," including, "a deprivation of counsel in violation of the Sixth Amendment, as opposed to mere technical errors." *Denedo*, 556 U.S. at 911 (2009) (discussing *Morgan*, 346 U.S. at 513). "Violations of the Sixth Amendment right to counsel, including claims of ineffective assistance of counsel, are fundamental error[s] that may be redressed through coram nobis." *Williams*, 2022 WL 3211805, at *3 (citing *United States v. Newman*, 805 F.3d at 1146 and *United States v. Denedo*, 556 U.S. at 911) (internal citations omitted). "To demonstrate a fundamental error based on ineffective assistance of counsel, a defendant carries the burden of demonstrating 'that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms,' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Williams*, 2022 WL 3211805, at *3 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

As demonstrated below, Mr. Nassiri is entitled to the issuance of the writ of error coram nobis as his petition satisfies the four-part *Verrusio* analysis. As Mr. Nassiri is ineligible to seek habeas corpus relief because he is no longer in custody, the writ is the only means available for Mr. Nassiri to attack his conviction. *See Morgan*, 346 U.S. at 512. Further, a fundamental error occurred as Mr. Nassiri's trial counsel rendered constitutionally ineffective assistance of counsel by affirmatively misadvising Mr. Nassiri regarding the immigration consequences of his plea and conviction. *See Williams*, 2022 WL 3211805, at *3. As a result, Mr. Nassiri has faced and continues to suffer significant adverse immigration consequences due to his counsel's fundamental

constitutional errors. *See id.* Finally, valid reasons exist for not attacking his conviction earlier due to inaccurate and incomplete advice from consulting counsel over the past decades. *See id.*

### A. The Error in Mr. Nassiri's Matter is of the Most Fundamental Character & Adverse Consequences Exist: Mr. Nassiri's Trial Counsel Rendered Constitutionally Ineffective Assistance of Counsel by Affirmatively Misadvising Regarding Significant Immigration Consequences

Sassan Nassiri was denied his Sixth Amendment right to the effective assistance of trial counsel due to his trial counsel's affirmative misadvise regarding the immigration consequences of his plea. A criminal defendant's right to assistance of counsel throughout all critical stages of his prosecution is guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 684-685 (1984). Due to the critical role a defense attorney plays in the functioning of the criminal justice system, the Supreme Court held that the right to counsel implicitly includes a right to the *effective* assistance of counsel. *Strickland*, 466 U.S. at 685.

In *Strickland*, the Court held that to demonstrate ineffective assistance of counsel, a petitioner must show: (1) that trial counsel's performance was deficient; and (2) that the deficient performance prejudiced the proceedings against the defendant. *Id.* at 687. *See also United States v. Bikundi*, 2021 WL 3403936, at *4 (D.D.C. Aug. 4, 2021). Sixth Amendment violations, "'including claims of ineffective assistance of counsel, are "fundamental error[s]"'" that may be redressed through coram nobis. *See Newman*, 805 F.3d at 1146 (citing *Denedo*, 556 U.S. at 911).

As discussed, in-depth *infra*, trial counsel's performance in Mr. Nassiri's matter was constitutionally deficient under *Strickland* and Mr. Nassiri has suffered significant prejudice due to trial counsel's constitutional errors. As both prongs of *Strickland* – deficient performance and prejudice – have been met, trial counsel rendered ineffective assistance of counsel. As such, Mr.

Nassiri has satisfied the third and fourth prongs of the *Verrusio* analysis. *See Verrusio*, 2017 WL 1437055, at *8.

  **1.**    **Trial Counsel's Performance was Constitutionally Deficient By Affirmatively Misadvising Mr. Nassiri of the Immigration Consequences of His Plea**

  This Circuit has explicitly held that trial counsel's affirmative misadvice or misstatements regarding potential immigration consequences can form the basis of a cognizable claim of constitutionally ineffective assistance of counsel. *See Newman,* 805 F.3d at 1147. *See also United States v. Williams*, 2022 WL 3211805 (D.D.C. Aug. 9, 2022). As stated in *Williams*:

> The court of appeals nevertheless concluded in <u>Newman</u> that if a lawyer <u>chooses</u> to advise a client of the immigration consequences of their plea, the advice must be accurate. In other words, if a lawyer "affirmatively misrepresent[s]" or misstates "the potential immigration consequences of a conviction," such conduct could support a cognizable claim of ineffective assistance of counsel. The court reasoned that even before <u>Padilla</u>, providing "erroneous immigration advice" could form the basis of an ineffective assistance of counsel claim because this conduct would infringe a criminal defendant's fundamental right to effective representation under the Sixth Amendment – a right that was established "at the time" of Mr. Newman's conviction.

*Williams*, 2022 WL 3211805, at *3 (quoting *Newman*, 805 F.3d at 1147) (internal quotations and citations omitted).

  In the instant matter, trial counsel affirmatively misadvised Mr. Nassiri that his plea would not render him presumptively deportable and left open the possibility of LPR status. As averred in Mr. Nassiri's affidavit:

> 6.   Prior to my guilty plea in this case, my attorney advised me that my guilty plea and conviction: (1) would not make me presumptively deportable; (2) would not prohibit me from adjusting my status to become a legal permanent resident.

> 7.   Relying on my trial counsel's advice, I pleaded guilty in this case.

Ex. 1 ¶¶6-7, at 1.

Relying on this affirmative misadvice, Mr. Nassiri pleaded guilty to the instant offense. However, as discussed in detail below, in direct contravention of his trial counsel's erroneous affirmative misadvice, Mr. Nassiri was immediately rendered presumptively deportable, inadmissible, ineligible for any waiver of inadmissibility and he was permanently ***prohibited*** from adjusting his status to legal permanent residency as a result of his plea and conviction. *See* 8 U.S.C. § 1182(a)(2)(C)(i).

Trial counsel's affirmative misadvise regarding removal and permanent residency is not only evidenced by Mr. Nassiri's own recollection, but more importantly, by trial counsel's own sentencing allocution at Mr. Nassiri's sentencing:

> … but here's a young man, who just got his degree from college, your Honor, and started graduate school, who is going to carry around a felony around with him for the rest of his life, if he is permitted to stay in this country.
>
> [Mr. Nassiri] has applied for a permanent visa. We don't know what the status is. We met with Mr. Roberts a couple of weeks ago. We don't know what's going to happen to that. He has an immigration attorney working on it, your honor.

Sentencing Hr'g Tr. at 4, *United States v. Nassiri-Motlagh*, No. 1:84-cr-00456 (D.D.C. March 7, 1985), attached as Exhibit 15.

These statements reflect trial counsel's profound misunderstanding of the immigration consequences that would result from Mr. Nassiri's plea and conviction. Indeed, had trial counsel known and given accurate advice --- that a plea to conspiracy to possess and distribute cocaine would render him presumptively deportable and be a complete and permanent bar to legal permanent residency ---  trial counsel would not have allocuted "if he is permitted to stay in this

country," and "we don't know what's going to happen to [Mr. Nassiri's permanent residency application]."  Instead, trial counsel would have allocuted that Mr. Nassiri's plea and conviction would assuredly result in Mr. Nassiri's presumptive deportation and permanently bar Mr. Nassiri from permanent residency.

As trial counsel voluntarily chose to affirmatively advise Mr. Nassiri regarding immigration consequences, even prior to *Padilla*, the Sixth Amendment required that the advice be **correct**.  As stated in *Williams*, ". . . if a lawyer <u>chooses</u> to advise a client of the immigration consequences of their plea, the advice must be accurate. In other words, if a lawyer "affirmatively misrepresent[s]" or misstates "the potential immigration consequences of a conviction," such conduct could support a cognizable claim of ineffective assistance of counsel. *Williams*, 2022 WL 3211805, at *3 (quoting *Newman*, 805 F.3d at 1147) (internal citations omitted).  As trial counsel voluntarily opted to advise Mr. Nassiri regarding immigration consequences, and gave affirmative misadvice regarding the same, Mr. Nassiri was denied his Sixth Amendment right to constitutionally competent counsel.

> a.  <u>Trial Counsel Voluntarily Misadvised Mr. Nassiri Regarding Deportation: Mr. Nassiri's Plea and Conviction Rendered Mr. Nassiri Presumptively Deportable in 1985 and He Remains Removable Today if He Loses His Asylee Status</u>

At the time of Mr. Nassiri's 1985 plea, the 1982 Alien Immigration and Nationality Act clearly specified that a conviction for conspiracy to unlawfully possess and distribute cocaine was a removable offense.

> (a) Any alien in the United States . . . shall, upon order of the Attorney General, be deported who--
>
> (11) Is, or hereafter at any time after entry has been, a narcotic drug addict, or who at any time has been convicted of a violation of, or a conspiracy to violate,

> any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marijuana, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacturing, production, compounding, transportation, sale exchange, dispensing, giving away, importation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispending, giving away, importation, or exportation of opium, coca leaves, heroin, marihuana, any salt derivative or preparation of opium or coca leaves or isonipecaine or any addiction-forming or addiction-sustaining opiate;

8 U.S.C. § 1251(a)(11) (1982) (INA § 241(a)(11). Accordingly, at the time Mr. Nassiri entered his guilty plea, it was indisputable that he was presumptively deportable under the Act. In fact, that is precisely what occurred. As a direct result of his plea and conviction, not only was his pre-plea application for permanent residence (based on a visa petition that had been filed by his sister) denied in 1985, but he was also issued an Order to Show Cause ("OSC") placing him in deportation proceedings before the Baltimore Immigration Court on March 19, 1986. The OSC explicitly listed this conviction to conspiracy to unlawfully possess and distribute cocaine in violation of 18 U.S.C. § 371 as the basis for a criminal ground of deportation.

In the deportation proceedings, Mr. Nassiri filed for relief in the form of asylum and withholding of deportation. The immigration judge initially denied both Mr. Nassiri's requests for asylum and withholding of deportation, finding that the March 1985 federal conviction was a "particularly serious crime," ("PSC") which statutorily barred him from withholding of deportation and that Mr. Nassiri further did not warrant asylum in the court's exercise of discretion and pretermitted his asylum request. He was thus ordered deported, and Mr. Nassiri subsequently filed an appeal of the immigration judge's decision to the Board of Immigration Appeals ("Board").

On May 17, 1990, The Board issued an order that partially overruled and partially upheld the immigration judge's decision. Significantly, the Board held it was error for the immigration judge not to hold a full evidentiary hearing on the merits of Mr. Nassiri's asylum application and pretermit Mr. Nassiri's asylum request. To remedy the error, the Board ordered that case be remanded back to the immigration judge to hold a full evidentiary hearing for further consideration of the asylum request. Notwithstanding the asylum application remand order, the Board otherwise upheld the immigration judge's finding that Mr. Nassiri's March 1985 federal conviction was a PSC and that he was therefore statutorily precluded from withholding of deportation.

On remand to the immigration judge for reconsideration of Mr. Nassiri's asylum application, after a full evidentiary hearing, the immigration judge ultimately concluded that Mr. Nassiri merited asylum protection in the exercise of discretion and granted his request for this relief on March 14, 1991.

Notwithstanding his asylee status, Mr. Nassiri has lived in a state of immigration limbo, uncertainty and anxiety for the past thirty-three (33) years. As further discussed below, as Mr. Nassiri is permanently inadmissible and barred from ever obtaining permanent residency as a direct consequence of his plea and conviction, his ability to remain in the United States with his family depends solely on retaining his asylee status. As a result, Mr. Nassiri has lived with constant, underlying anxiety and worry, acutely aware that, should he lose his asylum status, he faces the serious threat of removal to Iran—where he remains at grave risk of persecution and

potential death—along with exile from his wife, daughter, and extended family, and the loss of the life he has built over decades.[19]

> **b.**   **Trial Counsel Voluntarily Misadvised Mr. Nassiri regarding Adjustment of Status to Permanent Resident: This Conviction Rendered Mr. Nassiri Permanently Inadmissible, Ineligible for a Waiver of Inadmissibility and Ineligible for Adjustment of Status to Permanent Resident**

Immediately following Mr. Nassiri's plea and instant conviction, he was rendered "excludable," or as it is now known "inadmissible," from the United States as a direct result of his plea and conviction pursuant to former INA § 212(a)(23), INA § 212(a)(2)(A)(i)(II). As a result of his inadmissibility, Mr. Nassiri is permanently prohibited from adjusting his status to that of a permanent resident as a direct result of his plea and conviction.  Not only did Mr. Nassiri's conviction render him inadmissible for permanent residence through a family-based petition, like the one his sister filed before his conviction, his controlled substance conviction permanently disqualified him from any DHS (or legacy INS) waiver of inadmissibility, which could have served as an exception to the ground of inadmissibility.  *See* former INA § 212(a)(23), INA § 212(a)(2)(A)(i)(II).  Had he been eligible for a waiver of inadmissibility, Mr. Nassiri would have been eligible to adjust to lawful permanent resident (LPR) status as an asylee. *See* 8 C.F.R. § 209(2)(b). As a direct result of his conviction, he remains permanently inadmissible, eternally disqualified from obtaining any waiver of inadmissibility and, as a result, will ***never*** be eligible for lawful permanent residence.

This is not a theoretical assertion – it is exactly what happened.  While Mr. Nassiri was otherwise eligible for adjustment of status in 1985 as he was inspected and admitted, and he had an immediately available visa – his sister's visa petition on his behalf, granted in 1985 -- his pre-

---

[19] *See* Amnesty Int'l, *Human Rights in Iran: Review of 2023/24* (Apr. 24, 2024), attached as Exhibit 16.

conviction adjustment of status LPR application was promptly denied on July 19, 1985, by the immigration service, in part, directly based on this conviction.

After having had asylum for several years, Mr. Nassiri sought to adjust from that of an asylee to a permanent resident based on his trial attorney's misadvice and filed his asylee adjustment of status application under INA § 209 on or around January 15, 1996.  In September 1996, legacy INS denied Mr. Nassiri's application for adjustment of status and 209(2)(b) waiver of inadmissibility.[20]  Indeed, Mr. Nassiri's conviction to conspiracy to distribute cocaine not only rendered him permanently inadmissible but also permanently prohibited him from obtaining a waiver of inadmissibility.

In denying his LPR application in 1996, legacy INS concluded that Mr. Nassiri was statutorily prohibited from obtaining a waiver of inadmissibility as his conviction rendered him excludable (inadmissible) and ineligible for a waiver as a "controlled substance trafficker:"

> Section 212(a)(2)(ii)(C) of the Act provides in part:
>
> (C) Controlled substance traffickers. -- Any alien who the consular or immigration officer knows or has reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance, is excludable.

Ex. 17 at 2 (citing 8 C.F.R. § 212(a)(2)(ii)(C)).  As a result, Mr. Nassiri was **prohibited from the moment he pleaded guilty and was convicted** from obtaining a waiver of the "reason to believe" that he was trafficking in narcotics inadmissibility ground pursuant to 8 C.F.R. § 209(2)(b):

> **(b) Inadmissible Alien.** An applicant who is inadmissible to the United States under section 212(a) of the Act, may, under section 209(c) of the Act, have the grounds of inadmissibility waived by the district director ***(except for those grounds under paragraphs (27), (29), (33), and so much of (23) as relates to trafficking in narcotics)*** for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

---

[20] *See* Benedict J. Ferro, District Director, U.S. Department of Justice Immigration & Naturalization Service, *Letter to Sassan Nassiri-Motlagh* (September 20, 1996), attached as Exhibit 17.

Ex. 17 at 2 (emphasis added).

As such, in direct contravention to the advice from his trial attorney, Mr. Nassiri can never obtain LPR status as a direct result of his conviction. Indeed, his conviction would eternally block his path to permanent residency. As a result, and notwithstanding his asylee status, Mr. Nassiri has endured significant hardship and consequences over the past thirty-three (33) years. For example, Mr. Nassiri's job opportunities and career advancement have been severely restricted due to his inability to obtain a security clearance, as many positions at his skill level involve government contracts that require security clearances. Additionally, his asylee status and inadmissibility prohibit him from traveling internationally, as he risks being denied re-entry into the United States, thus, further limiting his ability to pursue employment opportunities that require international travel and also prohibiting him from visiting family and friends abroad. Furthermore, recurring delays in renewal of his work authorization have jeopardized his employment, and the same delays have made it difficult to renew his driver's license due to REAL ID requirements, threatening to restrict his ability to drive and travel within the United States.

Pursuant to the foregoing, as trial counsel voluntarily opted to affirmatively advise Mr. Nassiri regarding immigration consequences, and gave affirmative misadvice regarding the same, trial counsel provided ineffective assistance of counsel. As such, Mr. Nassiri was denied his Sixth Amendment right to constitutionally competent counsel. *See Williams*, 2022 WL 3211805, at *3.

## 2. Mr. Nassiri was Prejudiced by Counsel's Constitutionally Deficient Performance

Sassan Nassiri was prejudiced by his trial counsel's constitutionally deficient performance. Once a defendant demonstrates that his counsel's representation fell below an objective standard of reasonableness, then he must show that his counsel's errors materially prejudiced him and that,

31

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The Supreme Court in *Strickland* stated that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, in the plea context, a defendant must show that there is a reasonable probability that, but for counsel's errors, "he would either have insisted on going to trial, *see Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), or obtained a plea deal with different immigration consequences, *see Missouri v. Frye,* —— U.S. —— –, 132 S.Ct. 1399, 1409, 182 L.Ed.2d 379 (2012)." *Newman*, 805 F.3d at 1147. *See also United States v. Aguiar*, 894 F.3d 351, 362 (D.C. Cir. 2018) (remanding for an evidentiary hearing on prejudice and noting that "[t]he Supreme Court did not suggest in *Lee* that a defendant must hypothesize his counsel's advice might be erroneous and state contemporaneously that his plea decision would differ if that were so," discussing *Lee v. United States*, 582 U.S. 357 (2017)); *See, e.g. United States v. Swaby,* 855 F 3d 233, 244 (4th Cir 2017) (concluding that a petitioner does not have to show that going to trial "would have been the best objective strategy or an attractive option. It merely requires the defendant to show a reasonable likelihood that a person in the defendant's shoes would have chosen to go to trial. The decision does not need to be optimal and does not need to ensure acquittal; it only needs to be rational"); *United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015) ("A petitioner may demonstrate that there existed a reasonable probability of negotiating a better plea by identifying cases indicating a willingness by the government to permit defendants charged with the same or a substantially similar crime to plead guilty to a non-removable offense."); *DeBartolo v. United States*, 790 F.3d 775, 779 (7th Cir. 2015) (noting that the petitioner "could have tried to negotiate a different plea deal for an offense that does not make deportation mandatory"); *Kovacs v. United States*, 744 F.3d 44, 52 (2d Cir.

2014) ("[A] petitioner must therefore demonstrate a reasonable probability that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on the petitioner's immigration status.").

As the Court stated in *Padilla*, "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence. Likewise, we have recognized that preserving the possibility of discretionary relief from deportation under [the old INA code] would have been one of the principle benefits sought by defendant deciding whether to accept a plea offer or instead to proceed to trial." *Padilla*, 559 U.S. at 368 (internal quotations and citations omitted). In cases involving harsh immigration consequences, "even the smallest chance of success at trial may look attractive." *Lee*, 582 U.S. at 367.

In considering the strength of a defendant's assertion that he would have risked going to trial rather than take a plea to avoid certain deportation, courts consider any "significant familial ties to the United States," *United States v. Akinsade,* 686 F.3d 248, 255 (4th Cir. 2012), and "strong connections to this country." *Swaby,* 855 F 3d at 244. In *Lee* the Supreme Court stated:

> We cannot agree that it would be irrational for a defendant in Lee's position to reject the plea offer in favor of trial. But for his attorney's incompetence, Lee would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly. If deportation were the "determinative issue" for an individual in plea discussions, as it was for Lee; if that individual had strong connections to this country and no other, as did Lee; and if the consequences of taking a chance at trial were not markedly harsher that pleading, as in this case, that "almost" could make all the difference.

*Lee*, 582 U.S. at 371 (emphasis original).

It is objectively reasonable that an accurately and properly advised defendant in Mr. Nassiri's circumstances would have sought an immigration-favorable or mitigating disposition and if none were available, chosen to go to trial and risk additional incarceration in an effort to

avoid permanent and significant immigration consequences.    Indeed, but for counsel's constitutional errors, Mr. Nassiri would not have pled guilty to an offense that rendered him presumptively deportable and prohibited him permanently from adjusting his status to that of a legal permanent resident.  *See* Ex. 1 at ¶¶ 12-14. Certainly, considering the potential fate of death that awaited him in Iran.   Mr. Nassiri would have assuredly pursued every possible plea negotiation to mitigate or eliminate the immigration consequences and if that failed, insisted on a trial. *See id*.  It is objectively reasonable that a properly advised defendant in Mr. Nassiri's position would have sought an immigration-harmless disposition and, if none were available, chosen to go to trial and risk further incarceration rather than face presumptive removal to Iran—and the potential of death—along with a complete bar to legal permanent residency.  *See id.*

As demonstrated *supra*, above all, remaining in the United States was a matter of life or death for Mr. Nassiri. The very real threat of violence and death in Iran far outweighed any jail or probationary sentence he faced in this case. Additionally, at the time of his plea, the majority of Mr. Nassiri's family had already escaped the Ayatollah's brutal regime and were living safely in the United States. If forced to return to Iran, he would be entirely alone—without any family support—facing the imminent threat of death. While this peril eclipses all other concerns, the loss of his family, the life he built in the United States, the inability to complete his education and the permanent prohibition from becoming an LPR further underscore that Mr. Nassiri would have definitively chosen a different path had he known and understood the true immigration consequences of his plea.

Furthermore, the stark and profound disparity between the potential and resulting sentence in this matter and the extremely harsh immigration consequences that followed objectively

demonstrate the likelihood that if properly advised, Mr. Nassiri would have opted for any alternative potential immigration-mitigative path. Ultimately, Mr. Nassiri received a three-year sentence with all but six months suspended, which was subsequently reduced to only approximately seven weeks in jail. In stark contrast, the disproportionate and severe lifelong immigration consequences—removal, with the risk of facing potential death, exile from his entire family, and a permanent bar from ever becoming a legal resident—were grossly out of proportion to both the underlying offense and the potential or actual sentence. In the end, Mr. Nassiri was condemned to a life sentence of draconian and severely disproportionate immigration consequences, despite serving only seven weeks in jail almost forty (40) years ago for an offense that would likely have led to a similar outcome even if he had pled or been found guilty of the initial charge. As a result, it is more than reasonable to believe that had Mr. Nassiri been properly advised that pleading guilty would condemn him to presumptive removal and permanently bar him from LPR adjustment, he would have chosen *any* alternative path in an attempt to avoid such certain and extreme immigration consequences.

### a.    If Properly Advised, Mr. Nassiri Would Have Sought Alternative Immigration-Mitigative Plea Options

Under these dire circumstances, it is axiomatic that Mr. Nassiri, through constitutionally competent counsel, would have sought an immigration-mitigative plea to a crime that would have either minimized or eliminated the immigration consequences. *See Newman*, 805 F.3d at 1147. In consideration for an immigration-mitigative plea, Mr. Nassiri would certainly have agreed to a longer prison and/or probationary sentence or any additional sentencing consequences.

There is a reasonable probability that the government would have been amenable to alternative immigration-mitigative plea options if trial counsel had accurately conveyed and attempted to mitigate the immigration consequences. Indeed, the government had already shown a willingness to negotiate a plea in the matter by offering a plea to conspiracy — a charge that carried a five (5) year maximum penalty, which was ten (10) less years less of maximum jail time from the original 15-year maximum PWID charge.

Certainly, in light of the ultimate plea offer in this case, it is entirely reasonable to believe that the government would have been willing to allow Mr. Nassiri to plead guilty to an immigration-mitigative crime that carried a higher maximum penalty or resulted in the same or similar sentence Mr. Nassiri ultimately received. Pursuant to the sentencing hearing, it appears that the government's greatest concern involved the amount of active incarceration, not the guarantee of severe and permanent immigration consequences. It is certainly reasonable to believe under these circumstances that when presented with the accurate immigration consequences and proper mitigation, the government would have agreed to a different, immigration-mitigative disposition in exchange for the same or more aggregate prison and/or probation time.

Indeed, a potential immigration-mitigative plea option could have been a plea to Accessory After the Fact ("AAF"). *See* 18 U.S.C. § 3 (1982). AAF carried an even higher maximum penalty than the conspiracy charge – 7.5 years, instead of five (5) years.[21] An AAF conviction would have avoided any CDS categorical conviction and not rendered him a drug trafficker, thus he

---

[21] "Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both." 18 U.S.C. § 3.

would have been eligible for LPR adjustment and avoided presumptive removal. *See Matter of Batista-Hernandez*, 21 I. & N. Dec. 955 (BIA 1997) (BIA holding that an accessory after the fact to a drug trafficking offense is not a drug conviction or drug-trafficking aggravated felony).

Another possible immigration-mitigative plea option would have been a plea to Misprision of a Felony ("MF"). *See* 18 U.S.C. § 4 (1982). While MF carried a lesser maximum penalty of three (3) years, Mr. Nassiri was ultimately sentenced to three years on the conspiracy charge. Thus, there would have been no real difference in the ultimate outcome of the sentencing. While MF would have been an immigration-mitigative, but not eliminative, plea option, importantly, a conviction for MF would not have automatically led to a finding that there was a "reason to believe" that Mr. Nassiri was a drug trafficker, which now prohibits him from ever adjusting his status to that of LPR. Indeed, Mr. Nassiri would have been eligible to receive a waiver of inadmissibility with a misprision of a felony conviction.

Furthermore, even a plea to simple possession of a controlled substance under 21 U.S.C. § 844 would have been a markedly more favorable immigration-mitigative option than the conspiracy charge. Although both possession of cocaine and conspiracy would have then rendered Mr. Nassiri presumptively deportable under 8 U.S.C. § 1251(a)(11) (INA 241(a)(11) and, today, inadmissible pursuant to 8 U.S.C. § 1182(a)(2)(A)(i)(II); INA § 212(a)(2)(A)(i)(II), the **critical difference** is that, with a possession conviction, he would have been eligible to adjust to LPR status as an asylee by submitting a waiver: Form I-602. Application by Refugee for Waiver of Inadmissibility Grounds ("Form I-602"). 8 U.S.C. § 1159(c), INA § 209(c); 8 C.F.R. § 209(2)(b); 8 C.F.R. 1209.2(b); USCIS Policy Manual[22] vol. 7, pt. L, ch. 3.B. and D. Significantly, possession of a controlled substance –including cocaine -- does not fall within any exception to the I-602

---

[22] Hereinafter "USCIS-PM."

waiver, including any exception related to "controlled substance *traffickers*." *See* INA 212(a)(2)(C).[23] *See also Lenor v. U.S. Attorney Gen.*, 799 Fed. Appx. 780, 787-88 (11th Cir. 2020) (denying petition in part, finding that the Board did weigh all material relevant factors in considering § 1159(c) waiver of inadmissibility for a Florida possession of cocaine conviction, among other convictions). Additionally, and importantly, not only would a conviction for possession of cocaine have been waivable, but it also would not have automatically led an adjudicator to find "reason to believe" that Mr. Nassiri was a controlled substance trafficker.

Given the severe familial, humanitarian, and political persecution consequences Mr. Nassiri faced, legacy INS would likely have granted a Form I-602 waiver had he been convicted of possession of cocaine, instead of conspiracy to distribute. Unlike other waivers of inadmissibility, Form I-602 "is a more generous waiver provision than what is used for general adjustments," which usually requires proving extreme hardship. USCIS-PM vol. 7, pt. L, ch.3.D. The I-602 waiver is a discretionary waiver in which the adjudicating officer "must balance the humanitarian, family unity, or public interest considerations with the seriousness of the offense. . ." *Id*. The fact that the asylee has already proven past persecution or a well-founded fear of future persecution "is an extremely strong positive discretionary factor" that an officer "should recognize." *Id*. As such, it is USCIS policy that "unless there are even stronger negative factors that outweigh the positive ones, the waiver application should generally be approved." *Id*.

Given Mr. Nassiri's circumstances and positive discretionary factors, it is very likely that USCIS would have granted the I-602 waiver in his case, thus removing the inadmissibility barrier

---

[23] USCIS's instructions to Form I-602 also include a section on "who should not file Form I-602" with an express list of grounds of inadmissibility. USCIS, *Form I-602, Instructions for Application by Refugee for Waiver of Inadmissibility Grounds*, https://www.uscis.gov/sites/default/files/document/forms/i-602instr.pdf. Simple possession of cocaine is not listed in section 8 U.S.C. § 1182(a)(2)(A). *Id*.

to adjustment.[24] *See Makir-Marwil v. U.S. Atty. Gen.,* 681 F.3d 1227 (11th Cir. 2012) (applying heightened standard for violent or dangerous individuals under *In re Jean*, 23 I. & N. Dec. 373 (U.S. Atty. Gen. 2002), but holding that the Board erred in not considering country conditions nor the refugee's own suffering when assessing hardship); *T-Q-P-*, AXXX XXX 775 (BIA June 25, 2024) (reversing judge's denial of respondent's adjustment application and § 1159(c) waiver of inadmissibility, despite murder conviction, finding that respondent merited favorable exercise of discretion based on hardship upon removal, rehabilitation, U.S. familial and community ties, and age when he committed his criminal conduct).

In addition to pursing alternative immigration-mitigative plea options, constitutionally competent trial counsel should have advocated for Mr. Nassiri's case to be prosecuted in the Superior Court of the District of Columbia instead of federal court by the same United States Attorney's Office. In Superior Court, a much broader array of misdemeanor and felony crimes were available for immigration-mitigative plea negotiations. For example, Mr. Nassiri could have pleaded guilty to disorderly conduct or traffic related charges– charges that would not have resulted in significant immigration consequences. By seeking to have Mr. Nassiri's case prosecuted in the Superior Court, trial counsel could have negotiated for a plea that could have significantly reduced or eliminated the risk of permanent bar of LPR status and/or presumptive removal.

---

[24] Indeed, in the event the conspiracy charge is vacated, and Mr. Nassiri is subsequently found guilty of possession of a controlled substance instead, we believe it is highly likely that USCIS would grant the Form I-602 waiver today— thus allowing him to adjust to that of a permanent resident.

**b.** **If Properly Advised, Mr. Nassiri Would Have Elected to Proceed to Trial if No Alternative Immigration-Mitigative Plea Options Were Available**

In the event constitutionally competent counsel could not secure an immigration consequence-mitigative disposition, it is axiomatic that Mr. Nassiri would have insisted on trial, rather than voluntarily forfeit any ability to ever become a legal permanent resident or worse, face a possible death sentence upon his removal to Iran.  At trial, Mr. Nassiri would at least have a chance, however slim, of acquittal and thereafter avoid presumptive removal and LPR bar.  *See Lee*, 582 U.S. at 367.  On the other hand, pleading guilty foreclosed any chance of adjusting to LPR status and rendered him presumptively deportable. Upon a guilty verdict after trial, any potential jail sentence Mr. Nassiri could have received paled in comparison to serious immigration consequences that followed.  Indeed, Mr. Nassiri would have run the risk of losing at trial and being sentenced to additional jail time rather than voluntarily presumptively rendering himself deportable to face possible death in Iran and foreclose any avenue to ever becoming a permanent resident.  As such, it is not merely speculative or irrational to assert that Mr. Nassiri would have insisted on going to trial based on the facts in this case; this assertion is entirely reasonable under the circumstances.

Furthermore, while Mr. Nassiri is not required to show a reasonable likelihood of success at trial to prove prejudice, he had two potentially viable affirmative defenses – entrapment and/or duress --  that he could have attempted to raise at trial.  *See Mathews v. United States*, 485 U.S. 58, 63 (1988) (discussing the two elements of entrapment, "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct."); *United States v. Nwoye*, 663 F.3d 460, 462 (D.C. Cir. 2011) (stating "[t]he affirmative defense of

duress is only available to a defendant who shows she acted 'under an unlawful threat of imminent death or serious bodily injury.'" (internal citations omitted)).  Although Mr. Nassiri may not have ultimately succeeded in raising any affirmative defense or prevailing at trial, the possibility of asserting an affirmative defense further supports the likelihood that he would have taken his chances at trial if no other immigration-mitigative option had been available.

Had Mr. Nassiri been accurately advised of the severe immigration consequences, any decision to risk going to trial on the original charge would have been further supported by the reasonable belief that the Court would not have imposed a harsher sentence than what he ultimately received for the conspiracy charge.  In 1985, Mr. Nassiri was not subject to the rigid sentencing structures of the United States Sentencing Guidelines that would have guaranteed a much more severe sentence had he been convicted after trial.  As the United States Sentencing Guidelines were not enacted until 1987 – two years after Mr. Nassiri's sentencing – the court had broad discretion and significant freedom to sentence Mr. Nassiri as it saw fit under the circumstances.  *See* 18 U.S.C. § 3551-3586.  Given the court's broad sentencing discretion, it is likely that Mr. Nassiri would have received a comparable sentence if found guilty of the original charge after a trial.  Additionally, Mr. Nassiri faced no enhancements or mandatory minimum penalties that would have acted as a significant deterrent to going to trial. As such, Mr. Nassiri had little to lose by throwing a "Hail Mary" and going to trial instead of pleading guilty to a charge that assured significant and permanent immigration consequences – and possible death.  *Lee*, 582 U.S. at 368.

Based on the foregoing, there is a reasonable probability that, but for counsel's constitutional errors, Mr. Nassiri would not have pled guilty to the instant offense and would have

insisted on going to trial if constitutionally competent counsel could not secure an immigration-mitigative disposition. *See Newman*, 805 F.3d at 1147. Therefore, Mr. Nassiri has satisfied the prejudice prong of the *Strickland* test.

Thus, having been denied his Sixth Amendment right to the effective assistance of trial counsel, Mr. Nassiri has satisfied the third and fourth prongs of the *Verrusio* analysis. *See Verrusio*, 2017 WL 1437055, at *8.

**B.      Demonstration of Valid Reasons for Not Attacking Conviction Earlier: Persistence in the Face of Erroneous, Conflicting, and Incomplete Legal Advice**

As a result of being misled by inaccurate and incomplete advice from post-conviction consulting counsel over the years, Mr. Nassiri can demonstrate valid reasons for not challenging his conviction earlier. *See Verrusio*, 2017 WL 1437055, at *8. As shown below, despite receiving incorrect, conflicting, and incomplete legal advice, Mr. Nassiri's persistence in seeking legal opinions over the years demonstrates his diligence in challenging his conviction. As a result, Mr. Nassiri can demonstrate reasonable grounds for his delay in challenging his conviction. *See United States v. Singh*, 718 F. Supp. 3d 1333, 1338 (D. Nev. 2024) ("[w]hile conflicting advice from counsel may be a reasonable cause for delay in some cases, *see Kwan*, 407 F.3d at 1013, 1014, it simply is not here . . . Singh's reason for delay in not attacking his conviction earlier . . . because of conflicting attorney advice—is undermined by the fact that Singh attacked his conviction earlier under the same circumstances.") (citing *United States v. Kwan*, 407 F.3d 1005, 1014 (9th Cir. 2005), *opinion amended on reh'g,* No. 03-50315, 2005 WL 1692492 (9th Cir. July 21, 2005), and *abrogated by Padilla v. Kentucky*, 559 U.S. 356 (2010)). Indeed, had Mr. Nassiri received accurate and complete legal advice earlier, he would have filed this petition years ago.

After legacy INS denied Mr. Nassiri's LPR application in 1996, he erroneously believed that no legal avenue was available to remedy his trial counsel's constitutional errors. However, in the late 2000s, at the urging of his now-wife, Anita, Mr. Nassiri sought out a legal opinion to explore whether any avenue existed to vacate his conviction due to counsel's constitutional errors. Their marriage, along with the birth of their only child, heightened the urgency of Mr. Nassiri's precarious immigration status. Unable to adjust to LPR status, Mr. Nassiri faced the constant threat of removal, which posed the devastating possibility of being separated from his family and sent to face potential death in Iran. Unfortunately, Mr. Nassiri was erroneously and unequivocally advised that no post-conviction remedy was available, as federal habeas corpus relief was only available to individuals in custody, and the one-year statute of limitations had long since expired. Relying on this misadvice, Mr. Nassiri's mistaken belief that no legal avenue existed to remedy his situation was tragically reaffirmed.

Even in the face of what seemed to be legal certainty and unequivocal, albeit incorrect, advice, Mrs. Nassiri never gave up hope. She urged Mr. Nassiri to seek another legal opinion years later regarding any possible remedy. However, once again, Mr. Nassiri was not informed of the potential relief available through the writ of error coram nobis. Instead, he was erroneously advised that, even if there were a possibility of reopening the criminal case, he risked losing his asylee status and faced permanent exile from his wife, child, and entire family upon deportation to Iran—where a death sentence potentially awaits him. Though ultimately inaccurate, these risks were too great for Mr. Nassiri to take, especially given the vague and uncertain possibility of any legal remedy.

Years later, Mrs. Nassiri urged Mr. Nassiri to consult with one more attorney, one final time—a nationally renowned criminal immigration attorney. After decades of legal

43

misinformation and dead ends, Mr. Nassiri finally received competent, complete and accurate legal advice in 2023. It was then that he finally learned of a legal remedy that could potentially address his situation: the writ of error coram nobis. Upon learning of the existence of the potential remedy of coram nobis, Mr. Nassiri sought out local immigration and criminal counsel to thoroughly evaluate his case and is now filing the instant Petition.

Based on the foregoing, Mr. Nassiri has clearly demonstrated valid reasons for not challenging his conviction earlier. *See Singh*, 718 F. Supp. at 1338; *Kwan*, 407 F.3d at 1014. Mr. Nassiri continued to seek legal opinions over the years despite repeatedly receiving negative and unequivocal advice. It is axiomatic that had Mr. Nassiri received accurate and complete legal advice before 2023, he would have undoubtedly filed this petition years earlier. His ongoing and unwavering persistence in trying to rectify his legal situation, despite numerous legal setbacks, underscores the reasonableness of his delayed action. As such, Mr. Nassiri has satisfied the second prong of the *Verrusio* analysis. *See Verrusio*, 2017 WL 1437055, at *8.

### C.    Sassan Nassiri is Entitled to the Issuance of the Writ

Having established that Mr. Nassiri's claim satisfies all four elements of the *Verrusio* test, Mr. Nassiri is entitled to the issuance of a writ of error coram nobis. First, as Mr. Nassiri is not eligible for federal habeas corpus relief, no other legal remedy is available to challenge his conviction. As such, "a more usual remedy is not available." *See Williams*, 2022 WL at *3 (quoting *United States v. Verrusio*, No. 09-00256, 2017 WL 1437055, at *8 (D.D.C. Apr. 21, 2017)). Second, Mr. Nassiri has clearly demonstrated valid reasons for not challenging his conviction earlier, as his persistent efforts to seek a legal remedy were thwarted by inaccurate and incomplete legal advice over the past two decades. *See id.* Third, as detailed *infra*, significant adverse immigration consequences exist as a result of his conviction "to satisfy the case or

controversy requirement of Article III." *Id.*  Finally, Mr. Nassiri was denied his Sixth Amendment right to competent and effective counsel as his trial counsel voluntarily gave affirmative misadvice regarding the immigration consequences.  *See id.*

As Mr. Nassiri has satisfied all the elements of the *Verrusio* test, he is entitled to the issuance of a writ of error coram nobis to correct the miscarriage of justice that occurred in his case.

## V.    **CONCLUSION**

**WHEREFORE**, as Mr. Nassiri has satisfied all required elements of the *Verrusio* analysis and was denied his Sixth Amendment right to the effective assistance of trial counsel, he requests that this court issue a writ of error coram nobis and vacate the conviction and withdraw his plea in the above-captioned matter.

Mr. Nassiri requests a hearing on this matter.

Respectfully submitted,

**THE LAW FIRM OF
CARROLL CRUMBAUGH LOVE PLLC**

/s/ Carroll Virginia Crumbaugh Love
_____
Carroll Virginia Crumbaugh Love (477973)

*Washington, DC Office:*
400 7th Street NW
Suite 206
Washington, DC  20004

*Annapolis, MD Office & Mailing Address:*
918 Chesapeake Avenue
Suite 3R
Annapolis, MD 21403

Telephone (202) 861-0076
Facsimile  (202) 595-7042
cclove@cclovelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of October 2024, a copy of this Petition for Writ of

Error Coram Nobis, Exhibits and Proposed Order were served via electronic mail on the following:

Special Proceedings Section
Office of the United States Attorney for the District of Columbia
601 D Street NW
Washington, DC 20004
*USADC.ECFSpecialProceedings@usdoj.gov*

/s/ Carroll Virginia Crumbaugh Love

_____
Carroll Virginia Crumbaugh Love